IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HUSQVARNA AB and HUSQVARNA PROFESSIONAL PRODUCTS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 15-856-SLR-SRF |
| THE TORO COMPANY, | ) ) | |
| Defendant. | ) ) | |

## HUSQVARNA AB AND HUSQVARNA PROFESSIONAL PRODUCTS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:
Joseph R. Re
David Jankowski
KNOBBE, MARTENS, OLSON
  & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
(949) 760-0404

Karen Vogel Weil
Hans L. Mayer
KNOBBE, MARTENS, OLSON
  & BEAR, LLP
10100 Santa Monica Blvd., Sixteenth Floor
Los Angeles, CA 90067
(310) 551-3450

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
*Attorneys for Plaintiffs*

Dated:  August 5, 2016

**TABLES OF CONTENTS**

**Page No.**

I. INTRODUCTION ............................................................................................1

II. SUMMARY OF THE INTRINSIC RECORD ...............................................1

    A.     The '713 Patent Specification ...............................................................2

          1.     Background .................................................................................2

          2.     Detailed Description Of The Preferred Embodiments.................2

                 a.     The Single Belt Embodiments ..........................................4

                 b.     The Two Belt Embodiments ..............................................6

          3.     The Patent Claims......................................................................7

                 a.     The Use Of "Selectively" In The Claims.........................8

                 b.     The Use Of "Actuator" In The Claims .............................8

                 c.     The Use Of "Single Actuation Of The [Remote/Single] Actuator" In The Claims.............................................9

    B.     The Prosecution History of the '713 Patent........................................9

III. LEGAL STANDARD FOR CLAIM CONSTRUCTION .......................................10

IV. THREE DISPUTED TERMS FOR THE COURT TO CONSTRUE ....................11

    A.     "Selectively" .......................................................................................11

          1.     The Dispute................................................................................11

          2.     Consideration Of The Claims And Specification .....................12

          3.     Consideration Of The Prosecution History...............................14

          4.     Consideration Of Extrinsic Evidence........................................15

    B.     "Actuator" ...........................................................................................15

          1.     Consideration Of The Claims And Specification .....................15

          2.     Consideration Of The Prosecution History...............................17

          3.     Consideration Of Extrinsic Evidence........................................18

# TABLES OF CONTENTS
## (*cont'd*)

C.    "Single Actuation Of The [Remote/Single] Actuator" ..........................................18

    1.    Consideration Of The Claims And Specification .....................................18

    2.    Consideration Of The Prosecution History.................................................19

    3.    Consideration Of Extrinsic Evidence...........................................................20

D.    Alleged Indefiniteness Of Disputed Claim Terms.................................................20

V. CONCLUSION ...................................................................................................................20

# TABLES OF AUTHORITIES

**Page No(s).**

*MBO Labs., Inc. v. Becton, Dickinson & Co.,*
474 F.3d 1323 (Fed. Cir. 2007)............................................................................13

*Pall Corp. v. Micron Separations, Inc.,*
66 F.3d 1211 (Fed. Cir. 1995)............................................................................11

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005)............................................................... *passim*

*PODS, Inc. v. Porta Stor, Inc.,*
484 F.3d 1359 (Fed. Cir. 2007)............................................................................14

*Vitronics Corp. v. Conceptronic, Inc.,*
90 F.3d 1576 (Fed. Cir. 1996)........................................................................10, 13

## TABLE OF EXHIBITS

| Exhibit No. | Description | Joint Appendix/ Appendix Page Nos. |
|---|---|---|
| 1 | U.S. Patent 9,055,713 | JA0001–JA0021 |
| 2 | File History for U.S. Patent Application No. 14/377,736 (Parent patent application) | JA0022–JA0457 |
| 3 | File History for U.S. Patent Application No. 14/609,780 (Continuation patent application) | JA0458–JA0659 |
| 4 | File History for U.S. Patent Application/Control No. 90/013,662 (Reexamination of U.S. Patent 9,055,713) | JA0660–JA1023 |
| 5 | '713 Patent Claims With Elements Labeled And Disputed Claim Terms Highlighted | A0001–A0009 |
| 6 | U.S. Patent No. 6,082,083 | A0010–A0028 |
| 7 | U.S. Patent Application Publication No. US 2004/0168424 | A0029–A0047 |
| 8 | Excerpt from the Collins Dictionary (11th ed. 2011) published by HarperCollins Publishers | A0048–A0052 |

# I.  INTRODUCTION

U.S. Patent No. 9,055,713 is directed to improved all-wheel drive lawn mowers.  The parties have disputes over three claim terms from that patent: "selectively," "actuator," and "single actuation of the [remote/single] actuator."

"Selectively" appears multiple times throughout the claims.  Husqvarna proposes that the term has its ordinary meaning every time it appears.  Instead of construing the term "selectively," Toro proposes to construe only two of the claim elements in which the term appears.  Toro's proposed constructions have tailored meanings not taught by the patent and not followed by the Patent Office during prosecution of the patent.  Husqvarna proposes that the term "actuator" also has its ordinary meaning informed by the claims and specification.  Toro proposes a broadened meaning that conflicts with the term's usage in the claims.  With respect to "single actuation of the [remote/single] actuator," Husqvarna's proposal better comports with the ordinary meaning of the phrase and its use in the claims and specification.

Toro also contends that each of the disputed claim terms is indefinite.  They are not.  They consist of simple words used in the patent with their ordinary meanings.  They are readily understandable and have been interpreted with no difficulty by multiple Patent Examiners.

## II.  SUMMARY OF THE INTRINSIC RECORD

A copy of U.S. Patent No. 9,055,713 (the "'713 patent"), titled "All wheel drive, walk behind mower," is attached as **Exhibit 1**.  The '713 patent claims are reproduced with the disputed claim terms highlighted and claim elements labeled in **Exhibit 5**.  The patent includes eighteen claims, all of which are presently asserted in this case.

## A.   The '713 Patent Specification

### 1.   Background

Engine-equipped walk-behind lawn mowers were developed long ago that provide drive power to either a front or rear set of wheels of the mower.  Such mowers typically drive the front or rear wheels using power from a rotating shaft that also turns a cutting blade. (Ex. 1 at JA0014, 1:21–46.)  Walk-behind mowers have recently been developed that provide drive power to all four wheels to improve traction.  These mowers are often called "all-wheel drive" lawn mowers. Early all-wheel drive walk-behind lawn mowers typically required the operator to manipulate two or more actuators to place the mower into all-wheel drive mode. (*Id*. at 1:47–50.)

### 2.   Detailed Description Of The Preferred Embodiments

Figure 1 of the patent shows an embodiment of a walk-behind lawn mower with a gasoline powered engine 30 supported by a blade housing 20 that covers a rotatable cutting blade (not shown). (Ex. 1 at JA0003, Fig. 1.)  The mower includes front wheels 40 and rear wheels 42 that receive power based on the user's operation of a trigger controller 70 and presence bar 72. The trigger controller and presence bar are located on a handle assembly that includes upright handle members 60 and a cross bar 62. (*Id.* at JA0015, 4:53–67.)  The presence bar allows the operator to maintain or turn off the engine 30.  The trigger controller allows the operator to engage or disengage the transfer of power from the engine 30 to the front and rear wheels 40, 42. The operator operates the trigger controller by pulling either of the left/right "movable members" towards the cross bar 62. (*Id.*, 4:59–67.)  When operated, the trigger controller exerts tension on a cable that is operatively coupled to front and rear transmissions 110, 120, as will be discussed in more detail below.  The operator operates the presence bar by pushing the bar downward towards the cross bar. (*Id.*, 4:56–59.)  When operated, the presence bar exerts tension on a cable that is operatively coupled to the engine.

The specification teaches that the trigger controller 70 is an example of a "remote actuator." (Ex. 1 at JA0016, 5:1–3.) It further teaches that the trigger controller 70 may be configured to be a "single actuator." (*Id*., 5:9–12.) The terms "remote actuator" and "single actuator" both appear throughout the claims, and the parties dispute how the term **"actuator"** within those terms should be construed.

The operator can place the mower into three different modes of operation. The operator can place the mower into a first mode by pulling on starter handle 32 while operating presence bar 72. This turns on the engine. In this first mode, the engine is running and providing power to the cutting blade but no power is delivered to the wheels. The mower may be used in this mode as a push mower, cutting grass with the mobility of the mower coming from the operator. The patent sometimes refers to the first mode of operation as a "no wheel drive" mode. (*Id.* at JA0015, 3:57–4:9; 4:17–23; JA0018–21, Claims 1, 5–7, 14, 18.)

The operator can place the mower into a second mode by maintaining operation of presence bar 72 and operating trigger controller 70. In this second mode, power from the running engine is delivered to both the cutting blade and the front and rear wheels. (Ex. 1 at JA0015, 4:56–67.) The mower in this mode is engine-propelled, with the mobility of the mower coming from the engine driving the wheels. The patent sometimes refers to the second mode of operation as an "all wheel drive" mode. (*Id.* at 1:62–66; 2:52–56; 3:57–4:5; 4:10–17; 4:61–67; 5:9–13; Claims 1, 3, 5–7, 9–15, 17–18.) Through the operation/non-operation of trigger controller 70, the operator may mow a lawn switching between the first and second modes to meet the needs of the terrain.

In the claims, the act of operating the trigger controller once is recited as a "single actuation" of the remote actuator or single actuator. Claim 18, for example, recites: "wherein,

responsive to a ***single actuation of the single actuator***, the lawn mower is switched from a no wheel drive mode to an all wheel drive mode, wherein the single actuation comprises moving the single actuator from a first position corresponding to the no wheel drive mode to a second position corresponding to the all wheel drive mode[.]" (Ex. 1 at JA0021, 16:40–46.) The parties dispute how the term **"single actuation of the [remote/single] actuator"** should be construed.

The operator can place the mower into a third mode by releasing the presence bar, allowing it to move away from the cross bar. This turns off the engine. This mode may be used after the mowing is finished or during the mowing when the operator wants to push the mower over terrain without the cutting blade rotating. (*Id.* at JA0015, 4:17–23; 4:53–59.)

The specification teaches that the mower includes a rotatable drive shaft connected to the cutting blade "that may be turned responsive to operation" of the engine 30. (*Id.*, 4:1–5.) By turning the engine on or off, an operator controls whether the drive shaft 130 rotates or does not rotate. This is recited in each of the independent claims as: "**an engine . . . to selectively rotate a drive shaft**." (*See*, *e.g.*, *id.* at JA0021, 16:13-14.) The parties dispute how this claim language should be construed.

The patent discloses several embodiments for switching the mower from the first mode (no wheel drive mode) to the second mode (all wheel drive mode) using a single operation of the trigger controller 70. These include "single belt" embodiments (*id.* at JA0016–017, 5:19–8:42) and "two belt" embodiments (*id.* at JA0017–018, 8:43–10:16).

      a.      **The Single Belt Embodiments**

Figure 2 of the patent shows a view of an example of a single belt embodiment from below the blade housing. (Ex. 1 at JA0004, Fig. 2; JA0016, 5:19–6:54.) The mower includes a drive shaft 130 that is coupled to the engine 30 and that rotates when the engine is operating to rotate the cutting blade (not shown in Fig. 2). It includes front and rear axles 112, 122 that can

be rotated to provide rotational power to the front and rear wheels 40, 42. A single drive belt 100 follows a serpentine path that brings it into frictional contact with a drive shaft pulley coupled to the drive shaft 130, three "idler" pulleys 140, 142, and 144, and front and rear drive pulleys 114, 124 that are coupled to front and rear transmissions 110, 120. (Ex. 1 at JA0004, Fig. 2; JA0016, 5:19–53.)

Depending upon the relative positioning of the front and rear drive pulleys, the tensioning of drive belt 100 can be adjusted between a relaxed state and a taut state. When belt 100 is in a relaxed state, there is little if any friction between the belt and the drive pulleys, and the power from engine 30 to the drive shaft 130 is not transferred via the belt to the front and rear transmissions. This corresponds to the first mode of operation (no wheel drive). (*Id.* at JA0004, Fig. 2; JA0016, 6:23–49.)

When belt 100 is in a taut state, there is significant friction between the belt and the drive pulleys, and the power from engine 30 to the drive shaft 130 is transferred to the belt, which transfers rotational power to the front and rear drive pulleys 114, 124. The power in the drive pulleys is transferred via transmissions 110, 120 to axles 112, 122. The axles transfer the power to the wheels 40, 42. This corresponds to the second mode of operation (all wheel drive). (*Id.*)

Figure 3 of the patent shows a closer view of the rear transmission 120. (*Id.* at JA0005, Fig. 3; JA0016–017, 6:62–7:24.) Fig. 3 shows that the rear transmission can be rotated or rocked about an axis (shown by arrow 200), which causes the rear drive pulley 124 to move laterally away (shown by arrow 202) from the drive shaft pulley 132. This motion of the drive pulley 124 increases the path length of the belt 100, which increases the tension in the belt. (*Id.* at 6:55–7:24; 7:41–50.) Figure 4 of the patent shows that the front transmission 210 can be rocked in addition to, or instead of, the rocking of the rear transmission, to provide tension to the belt 100.

The rocking of the front and/or rear transmissions 110, 120 is caused by operating the trigger controller 70. (*Id.* at JA0006, Fig. 4; JA0016, 6:55–61; JA0017, 7:25–50.) Thus, operation of the trigger controller 70 causes the mower to shift from no wheel drive (with unrocked transmission(s) and a relaxed belt) to all wheel drive (with rocked transmission(s) and a taut belt).

### b.     The Two Belt Embodiments

Figure 7 of the patent shows a view of an example of a two belt embodiment from below the blade housing. (Ex. 1 at JA0009, Fig. 7; JA0017–018, 8:47–9:19.) Like the single belt embodiments, the two belt embodiments rely on transferring power from the drive shaft 130 that is coupled to the engine and rotates when the engine is operating. But instead of using a single drive belt following a path that extends to both of the front and rear transmissions, these embodiments rely on two drive belts: a front drive belt 300 that extends between the drive shaft 130 and the front transmission 110 and a rear drive belt 310 that extends between the drive shaft 130 and the rear transmission 120. (*Id.* at Figs. 3, 4, 7, 8; 6:39–49; 8:46–9:16.)

The two drive belts 300, 310 make frictional contact with a drive shaft pulley 132′ (which may include a stacked arrangement of pulleys) that is coupled to the drive shaft 130. The front drive belt 300 makes frictional contact with front drive pulley 114, which is coupled to front transmission 110. The rear drive belt 310 makes frictional contact with rear drive pulley 124, which is coupled to rear transmission 120. Figure 8 of the patent shows a perspective view of these features. (*Id.*)

Similar to the operation of the single belt embodiments discussed above, the tensioning of the two drive belts 300, 310 may be adjusted into a relaxed state or a taut state. When the drive belts are in a relaxed state, there is little if any friction between the belts and the drive pulleys they contact, and the power from the engine to the drive shaft 130 is not transferred via the belts

to the transmissions. This corresponds to the first mode of operation (no wheel drive). (*Id.* at JA0017–018, 8:59–9:20.)

When drive belts 300, 310 are in a taut state (by operating trigger controller 70), there is significant friction between the belts and the drive pulleys they contact, and the power from the engine to the drive shaft 130 is transferred to the two belts, which transfer rotational power to the front and rear drive pulleys. The power in the drive pulleys is transferred via the front and rear transmissions to the front and rear axles, which transfer power to all four wheels. This corresponds to the second mode of operation (all wheel drive). (*Id.*)

**3.**     **The Patent Claims**

Claims 1, 9, 10–14, 17, and 18 are in independent form. Claim 18 is illustrative:

18. A walk-behind lawn mower comprising:

    [a] blade housing;

    [b] **an engine supported at least in part by the blade housing to selectively rotate a drive shaft**, wherein the drive shaft comprises a first drive shaft pulley and a second drive shaft pulley, and wherein the first drive shaft pulley is positioned between the engine and the second drive shaft pulley;

    [c] a mobility assembly **selectively** operably coupled to the engine to provide mobility of the lawn mower responsive at least in part to operation of the engine, wherein the mobility assembly comprises a front set of wheels and a rear set of wheels;

    [d] a drive system comprising: . . . a front axle . . . a front transmission . . . a first drive belt . . . a rear axle . . . a rear transmission . . . a second drive belt . . . and;

    [e] a handle assembly operably coupled to the blade housing, wherein the handle assembly comprises a remote **actuator**, wherein the remote **actuator** is a single **actuator**, and wherein the single **actuator** is operably coupled to the front transmission and to the rear transmission;

    [f] wherein, responsive to a **single actuation** of the single **actuator**, the lawn mower is switched from a no wheel drive mode to an all wheel drive mode, wherein the **single actuation** comprises moving the single **actuator** from a first position corresponding to the no wheel drive mode to a second position corresponding to the all wheel drive mode, and wherein the **single actuation** causes the front transmission to rotate about the front axle and causes the rear transmission to rotate about the rear axle, . . . .

(*Id.* at JA0021, 16:11–48 (bracketed labels and emphasis added).)

Element [d] recites a drive system that includes first and second drive belts, showing that Claim 18 is directed to a two belt embodiment. All eighteen claims are directed to two belt embodiments.

### a. The Use Of "Selectively" In The Claims

"Selectively" appears in element [b] of Claim 18 as part of the recitation "an engine supported at least in part by the blade housing to *selectively* rotate a drive shaft." The claim term "selectively" also appears in element [c] as part of the recitation "a mobility assembly *selectively* operably coupled to the engine . . . ." Husqvarna proposes to construe "selectively" to have a common meaning each time it appears in any of the claims. Toro proposes to construe the entire phrase "an engine supported at least in part by the blade housing to selectively rotate a drive shaft" in element [b], and to leave "selectively" in element [c] unconstrued.

Independent Claims 1, and 9–13 have a similar structure to Claim 18, and each recites the language Toro proposes to construe. Each also recites "a mobility assembly *selectively* operably coupled to the engine . . . .," which Toro proposes to leave unconstrued.

Independent Claims 14 and 17 have a similar structure to Claim 18, and each recites "an engine to *selectively* rotate the drive shaft," which is an abbreviated form of the language from Claim 18, element [b]. Toro also proposes to construe this phrase in its entirety.

### b. The Use Of "Actuator" In The Claims

"Actuator" appears multiple times in elements [e] and [f] of Claim 18 within the claim terms "remote actuator" and "single actuator." The other independent claims each use "actuator" in a similar manner. Dependent Claims 4–7 recite "remote actuator." Dependent Claims 6 and 7 also recite "single actuator."

### c. The Use Of "Single Actuation Of The [Remote/Single] Actuator" In The Claims

"Single actuation [of the single actuator]" appears three times in element [f] of Claim 18. The independent claims each use "single actuation [of the single actuator]" and/or "single actuation [of the remote actuator]" in a similar manner. Dependent Claims 5–7 also recite a "single actuation [of the remote actuator]."

### B. The Prosecution History of the '713 Patent

The '713 patent issued on June 16, 2015, from U.S. Patent Application No. 14/609,780 (the "'780 Application"), which was filed on January 30, 2015. The '780 Application was filed as a continuation of U.S. Patent Application No. 14/377,736 (the "'736 Application"), which was filed on February 13, 2012, as Application No. PCT/US2012/024853. Copies of the prosecution histories for the '736 and '780 Applications are attached as **Exhibits 2** and **3**, respectively. In February 2016, the U.S. Patent & Trademark Office ("USPTO") instituted an *ex parte* reexamination of the '713 patent, Application No. 90/013,662 (the "Reexamination"). A copy of the prosecution history from the Reexamination is attached as **Exhibit 4**.

In the '780 Application, the USPTO issued a non-final Office Action dated March 5, 2015. (Ex. 3 at JA0593–597). In that Office Action, Examiner Robert Pezzuto rejected a number of then-pending claims as anticipated by WO 2009/000344 ("Rivolta") (Ex. 3 at JA0513–520). Examiner Pezzuto indicated that one pending claim was allowed, and eight other pending claims contained allowable subject matter. (Ex. 3 at JA0595–596.)

The patent applicant filed a Response amending certain claims to incorporate allowable subject matter; rewriting certain claims in independent form; and cancelling other claims. (Ex. 3 at JA0605–616.) On May 11, 2015, Examiner Pezzuto issued a Notice of Allowance that allowed all of the then-pending claims. (*Id.* at JA0622–623.)

In the Reexamination of the '713 patent, the USPTO issued an Office Action dated May 19, 2016. (Ex. 4 at JA0886–907). In that Office Action, Examiner Russell Stormer rejected claims based on four grounds. Ground 1 rejected Claims 1, 2, 4, 5, and 8 as anticipated by Rivolta. Ground 2 rejected Claims 1–8 as being obvious over U.S. Patent No. 6,082,083 to Stalpes in view of Rivolta. Ground 3 rejected Claims 1–4 and 6–18 as obvious over Stalpes in view of U.S. Patent No. 6,425,452 to Steiner. Ground 4 rejected Claims 10, 11, and 18 as obvious over Stalpes in view of Steiner and U.S. Patent No. 4,907,401 to Nemoto. (*Id*. at JA0894–904.)

The patent owner filed a response to the Reexamination Office Action on July 19, 2016. (*Id*. at JA0964–1005.) In the response, the patent owner amended Claims 1 and 4, amended dependent Claims 6 and 7 into independent form, and proposed new Claims 19–53. (*Id*. at JA0965–968, JA0975–978.)

### III.  LEGAL STANDARD FOR CLAIM CONSTRUCTION

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id*. at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question . . . can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently

throughout the patent . . . ." *Id.* (internal citation omitted). Likewise, "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314–15 (internal citation omitted).

Courts have discretion to rely on "extrinsic evidence," such as expert testimony and technical treatises, to determine the customary meaning of a term. *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995). A court should disregard extrinsic evidence that is at odds with the intrinsic record. *Phillips*, 415 F.3d at 1317.

## IV. <u>THREE DISPUTED TERMS FOR THE COURT TO CONSTRUE</u>

### A. <u>"Selectively"</u>

| Husqvarna's position | Toro's position |
|---|---|
| **"Selectively"** (Claims 1, 9–14, 17, 18) "In a manner that allows for selection." | **"An engine supported at least in part by the blade housing to selectively rotate a drive shaft"** (Claims 1, 9–13, 18) This claim term is indefinite, or alternatively: "An engine, supported at least in part by the blade housing, capable of being operated with and without rotating the drive shaft." <br><br> **"An engine to selectively rotate the drive shaft"** (Claims 14, 17) This claim term is indefinite, or alternatively: "An engine capable of being operated with and without rotating the drive shaft." |

### 1. <u>The Dispute</u>

Husqvarna contends that "selectively" has its ordinary meaning each time it appears in the claims. Toro contends that only one use of "selectively" in variations of the phrase "an engine . . . to selectively rotate a drive shaft," should be narrowly construed to read only on engines that allow a drive shaft to be selectively rotated or not rotated *while the engine is on*,

thus excluding engines that allow a drive shaft to be selectively rotated or not rotated by turning the engine on or off. Toro does not seek to construe "selectively" when used in other phrases.

     2.     **Consideration Of The Claims And Specification**

The claims and specification support Husqvarna's construction. "Selectively" is used throughout the claims and specification, and in each appearance it is used as an adverb with its plain and ordinary meaning: "in a manner that allows for selection."

Independent Claims 1, 9–13, and 18, each recite "a mobility assembly ***selectively operably coupled to the engine*** to provide mobility of the lawn mower[.]" (*See*, *e.g.*, Ex. 1 at Claim 18, element [c].) The same phrasing appears in the specification: "The mobility assembly may include a first set of wheels and second set of wheels ***selectively operably coupled to the engine*** to provide mobility of the lawn mower[.]" (*Id.* at 2:39-41 (emphasis added).) Here, "selectively" modifies "operably coupled," indicating that the lawn mower allows for a selection of whether the recited "mobility assembly" (e.g., the front and rear wheels) is operably coupled to, and thus powered by, the engine. The patent teaches that the selection is allowed through the use of a user-operated controller, such as the trigger controller 70 of Figure 1. (*Id.* at 4:53–5:13; 7:39–43; 7:56–62; 8:21–24; 9:63–66; Fig. 1.). Toro does not seek to construe "selectively" in this context.

These same independent claims also recite "an engine supported at least in part by the blade housing ***to selectively rotate a drive shaft***[.]" The same phrasing appears in the specification: "The lawn mower may include a blade housing, an engine supported at least in part by the blade housing ***to selectively rotate a drive shaft***[.]" (*Id.* at 2:36–38.) Here, "selectively" modifies "rotate a drive shaft," indicating that the lawn mower allows for a selection of whether the recited "drive shaft" is rotated or not rotated. The patent teaches that the drive shaft rotates *responsive to* operation of the engine:

The cutting blade may be suspended above the ground at the end of *a rotatable shaft* (*e.g., a drive shaft*--again not shown in FIG. 1) that may be turned *responsive to operation of an engine 30*, such as a gasoline powered engine.

(*Id.* at 4:1–59.) The patent further teaches that the engine may be selected to be on or off via user-operated controllers, including the starter cord 32 and presence bar 72 of Figure 1. (*Id.* at 4:5–9; 56–59; Fig. 1.) By turning the engine on or off, an operator controls whether the drive shaft 130 rotates or does not rotate.

Toro's proposed construction is inconsistent with the claims and specification. There is no teaching in the patent of any structure, such as an engagement/disengagement mechanism between the engine and drive shaft, that would allow for a drive shaft that does not rotate when the engine is on. Nor is there is any teaching of a user-operated controller that would allow an operator to select between having the drive shaft rotating or not rotating while the engine is on. Toro's construction is thus at odds with the teaching of the patent specification, the single best guide to the meaning of the claims. *Vitronics*, 90 F.3d at 1582.

Because Toro's construction requires features not taught in the written description, it is also disfavored because it excludes the preferred embodiments disclosed in the specification. "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (quoting *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004)).

Toro's construction is also disfavored because it relies on a narrow meaning for "selectively" in element [b] while leaving "selectively" in element [c] unconstrued. Indeed, the narrow meaning Toro proposes when the term appears in element [b] would be nonsensical if

applied to element [c]. "We apply a 'presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.'" *PODS, Inc. v. Porta Stor, Inc*., 484 F.3d 1359, 1366 (Fed. Cir. 2007) (quoting *Fin Control Sys. Pty, Ltd. v. OAM, Inc*., 265 F.3d 1311, 1318 (Fed. Cir. 2001)).

### 3.     Consideration Of The Prosecution History

The prosecution history also supports Husqvarna's construction. Multiple USPTO Examiners have considered the term "selectively" during their examinations, including considering the larger phrase "to selectively rotate a drive shaft," and each time the Examiners have given the terms their plain and ordinary meanings consistent with Husqvarna's proposed construction.

For example, Examiner Pezzuto interpreted Rivolta's disclosure of an engine 40 coupled to a drive shaft 30 sufficient to meet "an engine . . . ***to selectively rotate*** a drive shaft." (Ex. 3 at JA0595.) The Rivolta engine is not disclosed as having the ability to operate with and without rotating the drive shaft 30 (*see* Ex. 3 at JA0514–517); thus, Examiner Pezzuto must have interpreted "to selectively rotate a drive shaft" to be met by the ability of the operator to turn the engine on or off, which in turn would cause the drive shaft 30 to rotate or not rotate. He made his understanding explicit when examining the '736 Application:

> Dvorak discloses a lawn mower (abstract) comprising: a blade housing (t); an engine (3) supported at least in part by the blade housing ***to selectively rotate*** (***via on and off state of engine***) a drive shaft (13) . . .

(Ex. 2 at JA0299.)

Examiner Russell Stormer interpreted the engine of Rivolta in the same manner as Examiner Pezzuto: "Rivolta discloses a lawn mower comprising a blade housing; ***an engine which selectively rotates a drive shaft 30***[.]" (Ex. 4 at JA0895 (emphasis added).)

### 4. Consideration Of Extrinsic Evidence

While extrinsic evidence is not needed, the common dictionary definition of "selectively" (an adverb form of "selective") at the time of the invention further supports Husqvarna's construction. (Ex. 8 at A0051.)

Husqvarna's construction is also supported by common industry usage, as shown by other patents directed at lawn mowers, including patents owned by Toro: U.S. Patent No. 6,082,083 ("Lock 64 also allows the operator to *selectively* change mower 2 into a non-powered or hand push mower.") (Ex. 6 at A0024, 7:22–23); U.S. Patent Publ. No. 2004/0168424 ("By *selectively* positioning the lever(s) 144, the deck assembly 102, and thus the height of cut, may be raised or lowered."). (Ex. 7 at A0044, ¶ [0055].)

Here, the extrinsic evidence is consistent with the intrinsic record in supporting Husqvarna's proposed construction. *Phillips*, 415 F.3d at 1317.

### B. "Actuator"

| Husqvarna's position | Toro's position |
|---|---|
| "A user-operated controller, such as a trigger, lever, or knob, for moving or controlling something." | This claim term is indefinite, or alternatively: <br><br> "Part or group of parts for engaging an all wheel drive mode." |

### 1. Consideration Of The Claims And Specification

In the claims, "actuator" always appears within either of the following phrases: "remote actuator" or "single actuator." In the independent claims, "actuator" always first appears within "a remote actuator." The specification provides clear guidance on what is meant by a "remote actuator," stating "the trigger controller 70 provides one example of a remote actuator, . . . [i]n some cases, however, the trigger controller 70 may be replaced by a lever, knob, or other actuation device[.]" (Ex. 1 at JA0016, 5:1–5.) Thus, a "remote actuator" refers to a user-

operated controller, such as a trigger controller, lever, knob, or other actuation device that is remote from the drive system that it actuates. The specification further discloses:

> [t]he trigger controller 70 may be used to provide for remote actuation of various control functions. For example, pulling either or both of the movable members of the trigger controller 70 may cause adjustments to be made to one or more transmissions of the lawn mower 10 or may cause movement of components to actuate shifting from no drive operation . . . to an all wheel drive configuration[.]

(JA0015 at 4:59–67.) This shows that the "remote actuator" is used for the remote actuation of "various control functions" by, for example, "caus[ing] movement of components[.]" These combined teachings support Husqvarna's construction for an "actuator": "a user-operated controller, such as a trigger, lever, or knob, for moving or controlling something."

Toro's proposed construction is inconsistent with the claims and specification in two fundamental ways. First, it improperly reads into the claim term a specific intended purpose: "for engaging an all wheel drive mode." Yet "actuator" is a general term that, by itself, does not convey a specific intended purpose. Construing the term to deviate from the general meaning requires an expression of clear intent from the patentee. *Phillips*, 415 F.3d at 1312–13. The patent includes no such expression.

Reading an intended purpose into the claim term is also improper because the claims consistently recite *the purpose* of the "actuator" separately from *the term* itself. This is well shown by elements [e] and [f] of Claim 18. Element [e] recites a handle assembly that comprises a remote actuator that is a single actuator. (Ex. 1 at JA0021, 16:35–39.) Element [f] separately recites the specific purpose of actuating the actuator: "wherein, responsive to a single actuation of the single actuator, ***the lawn mower is switched from a no wheel drive mode to an all wheel drive mode***[.]" (*Id*., 16:40–42.) This recitation of purpose separate from the term dictates that it is improper to read that purpose into the meaning of "actuator." *Phillips*, 415 F.3d at 1314 ("the

claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.").

Toro's proposed construction is also improper because it is inconsistent with the teaching in the claims and specification that the claimed invention may be practiced using a single trigger, lever, or knob. Throughout the claims, this teaching is presented by reciting that the "remote actuator" can be a "single actuator." (*See* Ex. 1 at JA0019, 11:51 (Claim 6), 11:56 (Claim 7); at JA0020, 14:19–20 (Claim 12), 14:56 (Claim 13); at JA0021, 15:21 (Claim 14), 16:3 (Claim 17), 16:37 (Claim 18).) This is fully supported by the specification: "[S]ome embodiments may provide for a transfer between all wheel drive and another drive mode (e.g., two-wheel drive or no wheels being powered) *using a single actuator* or actuation mechanism." (*Id*. at JA0015, 3:54–57.) "In an example embodiment, the remote actuator (e.g., the trigger controller 70) may be configured *to provide a single actuator* enabled to shift the lawn mower 10 between all wheel drive operation and another drive mode[.]" (*Id*. at JA0016, 5:9–12.)

Incorporating Toro's construction into "single actuator" results in: "single part or group of parts for engaging an all wheel drive mode." Under Toro's construction, a "single actuator" could thus encompass a "single" group of multiple triggers, levers, and/or knobs, which is the antithesis of the single actuator recited in the claims and taught by the specification.

## 2.    Consideration Of The Prosecution History

The prosecution history also supports Husqvarna's construction, as it confirms that a "single actuator" does not read on multiple levers, such as the two levers of Rivolta. This has been the conclusion of Examiner Pezzuto (Ex. 3 at JA0595–596), Examiner Stormer (Ex. 4 at JA0896–898), and the patent applicant (*Id.* at JA0984.)

### 3. Consideration Of Extrinsic Evidence

While extrinsic evidence is not needed, the common dictionary definitions of "actuator" (a noun form of "actuate") at the time of the invention further supports Husqvarna's construction. (Ex. 8 at A0050.)

## C. "Single Actuation Of The [Remote/Single] Actuator"

| Husqvarna's position | Toro's position |
|---|---|
| "One operation of the [remote/single] actuator." | This term is indefinite, or alternatively: "Activating the [remote/single] actuator only once." |

### 1. Consideration Of The Claims And Specification

The term "single actuation of the [remote/single] actuator" appears in each of the independent claims and in dependent Claims 5–7. The claims themselves provide ample guidance on what is meant by "single actuation." Element [f] of Claim 18, reproduced below in pertinent part (Ex. 1 at JA0021, 16:40–46), is illustrative:

> [f] wherein, responsive to a single actuation of the single actuator, the lawn mower is switched from a no wheel drive mode to an all wheel drive mode, **wherein the single actuation comprises moving the single actuator from a first position corresponding to the no wheel drive mode to a second position corresponding to the all wheel drive mode**[.]

As recited, the "single actuation" comprises a single act: moving the actuator (e.g., a movable member of trigger controller 70) from a first position (e.g., a position where the trigger controller is not operated) corresponding to the no wheel drive mode to a second position (e.g., a position where the trigger controller is operated) corresponding to the all-wheel drive mode.

The specification includes the same teaching. One operation of the trigger controller 70 causes the front and/or rear transmissions to rock, thus causing the front and rear drive belts to each become taut and make frictional contact with the front and rear drive pulleys, which allows

the rotational power from the drive shaft pulley (coupled to the engine via the drive shaft) to be conveyed through the two drive belts to the front and rear drive pulleys, which in turn allows the front and rear transmissions to convey power to the front and rear wheels. (Ex. 1 at JA0009, Fig. 7; JA0017–18, 8:49–9:20.)  This causes the lawn mower to switch from a no wheel drive mode to an all wheel drive mode, as recited in element [f].

Toro's proposed construction is inconsistent with the claims and the specification.  The claims and specification never state that the mower is put into all wheel drive mode in response to "activating the [remote/single] actuator *only once*."  To the contrary, the trigger controller 70 allows the operator to easily change the mower between no wheel drive and all wheel drive modes.  As such, activating the trigger controller 70 a second time, or a third time, will place the mower into all wheel drive each time.  This is inconsistent with Toro's construction, which requires that the activation of the [remote/single] actuator occur only once.

## 2. <u>Consideration Of The Prosecution History</u>

The prosecution history further supports Husqvarna's construction.  Multiple USPTO Examiners have considered the term "single actuation of the remote actuator" during their examinations, and they have consistently interpreted that claim term as referring to one operation of the remote actuator.  By way of example, when examining the '780 Application, Examiner Pezzuto rejected then pending Claim 1 based on Rivolta in part based on reading "single actuation of the remote actuator" onto one operation of either of the two levers 14, 24 (which he mislabels as 13 and 23). (Ex. 3 at JA0475, JA0595–596.)  Rivolta does not teach activating the levers 14 and 24 "only once."  Indeed, Rivolta contemplates the operator of the mower activating the levers 14 and 24 multiple times "to select either a rear wheel drive mode or a four wheel drive mode, depending on the type of land on which cutting has to be performed." (Ex. 3 at JA0514.)

### 3. Consideration Of Extrinsic Evidence

While extrinsic evidence is not needed, the common dictionary definitions of "single" and "actuation" (a noun form of "actuate") at the time of the invention supports Husqvarna's construction. (Ex. 8 at A0050, A0052.)

## D. Alleged Indefiniteness Of Disputed Claim Terms

Toro's indefiniteness challenges are meritless. Each of the disputed claim terms consists of simple words that would have been easy for a person of ordinary skill in the art to understand at the time of the invention. As discussed above, to a person of ordinary skill in the art, ample guidance on the scope of the claim terms is provided by the claims themselves as informed by the patent specification. As further discussed above, multiple USPTO Examiners have reviewed each of the disputed claim terms during the examination of multiple patent applications with no difficulty understanding the language.

## V. CONCLUSION

For the foregoing reasons, Husqvarna respectfully requests that the Court adopt Husqvarna's proposed constructions.

Respectfully submitted,

*/s/ John W. Shaw*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700

OF COUNSEL:
Joseph R. Re
David Jankowski
KNOBBE, MARTENS, OLSON
 & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
(949) 760-0404

jshaw@shawkeller.com
kkeller@shawkeller.com
*Attorneys for Plaintiffs*

Karen Vogel Weil
Hans L. Mayer
KNOBBE, MARTENS, OLSON
 & BEAR, LLP
10100 Santa Monica Blvd., Sixteenth Floor
Los Angeles, CA 90067
(310) 551-3450

Dated:  August 5, 2016